**Affirmed and Opinion filed February 25, 2022.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### NO. 14-19-00766-CV

**J.A.T., Appellant**

**V.**

**C.S.T, Appellee**

**On Appeal from the 280th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2019-21894**

# O P I N I O N

A father appeals a family-violence protective order issued by the trial court under title 4 of the Family Code. In the order the trial court found that the father had committed family violence and that family violence is likely to occur in the future. The trial court ordered the father not to (1) communicate directly with his daughter, (2) go within 400 feet of any location where the daughter is known by the father to be, (3) remain within 400 feet after the father becomes aware of his daughter's presence, or (4) go to or near his daughter's residence or school. The

trial court determined that the order would continue in full force and effect for eighteen years or until further order of the trial court. The daughter was twelve years old when the trial court issued the order. After carefully considering the arguments briefed by the father on appeal, we conclude that the father has not shown that the trial court erred in issuing the order. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Appellant J.A.T. (hereinafter "Father") and appellee C.S.T. (hereinafter "Mother") divorced in February 2014 when their daughter C.T. (hereinafter "Daughter") was seven years old. Under the parties agreed divorce decree, Father and Mother were appointed as joint managing conservators of Daughter with Father being awarded a standard possession order. Between the rendition of the divorce decree and December 2017, Father regularly exercised his periods of possession.

In August 2015 Mother and Father sought therapeutic treatment for Daughter with Dr. Staci A. Passe ("Passe") because Daughter was having difficulty making the transition through her parents' divorce and Daughter has "ADHD." Daughter began having periodic therapy sessions with Passe.

### *Father's Decision to Start Paying Only for the Required Expenses*

Father had been voluntarily paying for the entire amount of Daughter's school tuition and the entire amount of Daughter's uninsured medical expenses, even though Father was required under the divorce decree only to pay half of the tuition and sixty percent of the uninsured medical expenses. In the parties' divorce decree, the court ordered that neither Mother nor Father shall schedule any extracurricular activity for Daughter during the other party's periods of possession. According to Father, Mother had a penchant for scheduling various extracurricular

2

activities for Daughter during Father's periods of possession. Father complained to Mother about this issue. Eventually, Father sent an email to Mother stating that starting on September 1, 2017, Father would only pay for the expenses that he is responsible for paying under the divorce decree.

### *Daughter's Alleged Outcry*

Mother stated that on December 6, 2017, Daughter told Mother that one night when Daughter had fallen asleep at Father's house, Father entered her room. According to Mother, in describing what happened next, Daughter "talked about her legs being lifted up and feeling her — she said her dad's private parts between her legs and pushing into her." Mother stated that according to Daughter this incident occurred one to three months before December 6, 2017, and that Daughter begged Mother not to tell anyone about the incident because Daughter would "get in so much trouble." Daughter was ten years old when she made this outcry of alleged sexual abuse.

Mother did not contact any law enforcement entity that night but she emailed Passe explaining that she needed to talk to Passe right away. The next day, Daughter went to school, and Passe called Mother. Passe testified that during this phone call Mother told Passe that Daughter had disclosed that Father had engaged in a sexually inappropriate act with Daughter. According to Passe, Mother said that it seemed like Daughter was describing penetration. Passe and Mother agreed that Mother, Daughter, and Passe would meet the following day and then the Texas Department of Family and Protective Services ("CPS") would then be contacted.

### *Meeting with Passe*

On December 8, 2017, Mother and Daughter met with Passe. Daughter was crying and said she did not want to talk. Passe told Daughter that Passe "was just a

3

supporter, that [her] role was just a supporter." Daughter requested that Passe not ask her questions, and Passe told her that asking questions was not Passe's role. Passe then told Daughter that Mother had already told Passe that Father had engaged in inappropriate behavior with Daughter. According to Passe, she told Daughter this to alleviate Daughter's fear and remind Daughter that she did not need to report her story to Passe and that Passe was not an investigator. Daughter told Passe that Father's personal trainer, K.M. ("Trainer") was present during the alleged sexual abuse by Father. Passe told Daughter that Passe would have to report the alleged sexual abuse, and according to Passe, Daughter stated that she was not going to talk with anyone else and that maybe it was a dream.

### *CPS Investigation*

Passe reported the alleged sexual abuse to CPS on December 8, 2017. According to CPS records, Passe told CPS that (1) two days earlier Daughter stated that Father had sexually abused her and penetrated her one time, early in the morning; (2) Daughter "was unsure if it were a dream and believes it did happen"; and (3) the Trainer was in the room during the alleged sexual abuse.

CPS caseworker Cassandra Osborne set up a forensic interview of Daughter that took place on December 21, 2017. The CPS records describe Daughter's description of the alleged sexual abuse during this interview as follows:

> [Daughter] stated that one night when she was at her [Father's] house she had a dream that [Father] and [Trainer] came into her room. She stated that [Father] and [Trainer] were not wearing pants. She stated that [Father] picked her up by her ankles. She stated that [Father] did something inappropriate. She stated that [Father] touched her with his private part. She stated that she woke up and she not sure if it was a dream or not. She stated that [Father] lifted her upside down and she thinks that his private part went inside of her. She stated that [Trainer] was next to [Father] talking while this was going on. She stated that

4

she is not sure what they were talking about. [Daughter] stated that [Father's] penis touched her private part and the inside of her legs.

According to the CPS records, Daughter also told the interviewer that Daughter thinks the abuse was a dream because everything was normal the next day.

The day after Daughter's forensic interview, Daughter had a medical examination, and the CPS records reflect that Daughter made the same outcry to the medical staff that she had made in the forensic interview. Osborne testified that she did not review the medical report, but she heard that the medical examination found no evidence of abuse.

The day after the medical examination, CPS caseworker Osborne interviewed Father and Trainer. Father stated that the sexual abuse allegation is absolutely false and that he would never do anything like that to Daughter. Trainer stated that he is Father's personal trainer and that he and Father work out every morning at 5 a.m. Trainer said that he has known Daughter since she was a baby and that the sexual abuse allegation is false. Trainer stated that Trainer would never be involved in witnessing a child being abused. According to Trainer, Father is a good father, and Trainer has never witnessed Father being inappropriate with Daughter. Osborne testified that CPS asked Father not to have any contact with Daughter during its investigation and that Father agreed. Father did not agree in writing, and CPS did not ask Father to do so. Osborne testified that Father never agreed that he was never going to see Daughter again. Father sent CPS the results of a polygraph test that Father took showing Father was telling the truth. As far as Osborne knows there has been no movement by the sheriff's department for any type of criminal charges.

On March 23, 2018, CPS sent Mother a letter stating that CPS had completed its investigation of the alleged sexual abuse of Daughter by Father and

that CPS made a finding of "Unable to Determine," meaning that there was insufficient information to conclude whether the alleged abuse occurred. Osborne testified that based on Daughter's outcry, Osborne had told Mother that CPS was going to conclude that there was reason to believe based on a preponderance of the evidence that the alleged abuse occurred. But, according to Osborne, CPS made the "Unable to Determine" finding based on the polygraph test results and Daughter's uncertainty as to whether it was a dream.

The CPS records also indicate that in closing the investigation, CPS relied on (1) an alleged statement by Father that he will no longer communicate with Mother or Daughter; (2) an alleged decision by Father not to have contact with Daughter; (3) the appearance that Mother was protective of Daughter and appropriate; (4) the family's cooperation with the investigation; and (5) the fact that Daughter was in therapy.

### *Contacts Between Daughter and Father by Phone*

On October 24, 2018, Daughter contacted Father by phone. Though Father did not initiate this contact, he talked to Daughter and told her that she could call him at any time on someone else's phone from school or ballet. According to Father, Daughter told Father that if Mother found out about their communications, Daughter would tell Mother that she had mistakenly called Father. In addition, evidence before the trial court showed that Father told Daughter that Mother was keeping Father and Daughter apart and that the incident did not happen. Over the next month, Daughter and Father texted each other and talked on the phone. Father did not tell Mother or Passe or CPS about these communications with Daughter.

During a session with Passe on November 26, 2018, Daughter disclosed that she had been communicating with Father recently without Mother's knowledge. According to Passe's notes, (1) Daughter said that Father told Daughter that

"nothing happened"; (2) Daughter stated that she is certain that it did not happen because Father said it did not happen; and (3) Daughter said that had Father not denied it, Daughter would still believe that she was sexually abused by Father. That same day, Passe notified Mother of the communications between Daughter and Father, and these communications ceased soon thereafter.

Daughter stopped communicating with Father, and Father did not take steps to try to see Daughter in person at that time. Daughter continued seeing Passe and also received treatment and therapy from other professionals. Passe's notes reflect that in January 2019, Daughter continued to recant her allegations that Father sexually abused her and that in February 2019, Daughter said she had told two of her peers that she thought Father sexually abused her. Passe noted that Daughter had not recanted to these two peers.

### *Father's Filing of a Petition to Modify the Parent-Child Relationship*

On February 28, 2019, Father retired from his employment. Father testified that several millions of dollars in retirement benefits vested in his favor when he retired. Father indicated that he was concerned that the sexual assault allegations against him might cause him to lose these benefits before they vested. After Father retired, he decided that he wanted to see Daughter again.

On March 4, 2019, Father filed a petition to modify the parent-child relationship in the 311th District Court of Harris County, the court that issued the divorce decree agreed to by Mother and Father. The only modification Father requested in the petition was that Father be given the exclusive right to consent to any form of mental health care treatment or evaluation of Daughter. Father requested that Mother be required to give him a list of all mental health care providers who have provided any treatment or evaluation related in any way to Daughter. In the petition, Father did not state that he was seeking to modify the

7

existing possession order.

### *Father's First Attempt to Pick up Daughter from School*

On March 21, 2019, Father went to Daughter's school in an attempt to pick her up from school. Father testified that he wanted to have a two-hour visit with Daughter. Father testified that, as far as he was concerned, his oral agreement to have no contact with Daughter lasted only until the CPS investigation ended. Father said he planned to take Daughter to the home of one of his adult daughters, but Father was alone when he tried to pick Daughter up. Father acknowledged that he had not notified CPS or Passe that he intended to pick Daughter up. He stated that he emailed Mother in advance about his plan to do so, but that he did not hear back from her. He later learned that Mother had blocked him on her email account, so she did not receive Father's emails. Father did not know that Mother had blocked his emails when he tried to pick up Daughter. Father went to the school but did not succeed in picking up Daughter. Somebody from Daughter's school called Mother, and Mother came to the school to pick up Daughter.

### *Mother's Filing of Application for Protective Order*

Five days later, Mother file an application for a protective order in the trial court below, the 280th District Court of Harris County, which has been designated as the domestic violence district court for Harris County and gives preference to domestic violence cases.[1] Mother alleged that Father committed acts of abuse towards Daughter by engaging in sexual conduct that was harmful to Daughter's mental, emotional, or physical welfare. Mother alleged that these acts constituted family violence. Mother asked the trial court after notice and hearing to issue a protective order, with Daughter as the protected person. Mother alleged that Father

---

[1] *See* Tex. Gov't Code Ann. § 24.112(h), (i) (West, Westlaw through 2021 C.S.).

had committed an act constituting a felony offense involving family violence against Daughter, and therefore Mother requested that the term of the protective order exceed two years. Mother did not request a specific duration for the requested protective order. Mother submitted an affidavit and asked the court to issue a temporary ex parte order. Though Mother did not cite this statute, the substance of mother's application included an application for a protective order and a temporary ex parte order under Chapter 82 of the Family Code. On March 27, 2019, Mother also filed a petition to modify the parent-child relationship in the 311th District Court of Harris County.

### *The Temporary Ex Parte Protective Order*

On March 28, 2019, the trial court signed a temporary ex parte protective order ("Original Temporary Order") in which the trial court prohibited Father from (1) communicating in any manner with Daughter, except through Father's attorney or a person appointed by the trial court, (2) going to or near, or within 400 feet of, any location where Daughter is known by Father to be, and (3) remaining within 400 feet after Father becomes aware of Daughter's presence. Later that same day, Father appeared again at Daughter's school, unaccompanied by anyone else, and attempted to pick up Daughter. Father did not succeed in picking up Daughter, and while he was at her school Father was served with the Original Temporary Order.

### *The Evidentiary Hearing*

The trial court held an evidentiary hearing on Mother's application for a protective order that lasted for four days. At the hearing, Mother, Cassandra Osborne, Dr. Staci Passe, Father, Trainer, and three adult daughters of Father testified. Father and Mother's trial counsel also testified regarding attorney's fees. Father retained an expert but decided during the evidentiary hearing not to call the

9

expert as a witness on the merits at the evidentiary hearing.[2]

### *The Final Protective Order*

On June 24, 2019, the trial court signed a final protective order ("Order"). In the Order, the trial court found that family violence has occurred, that family violence is likely to occur in the future, and that Father has committed family violence. The trial court found that the protective orders contained in the Order are for the safety and welfare and in the best interest of Daughter and are necessary for the prevention of family violence. The trial court granted Mother exclusive possession of Daughter. In the Order, the trial court prohibited Father from, among other things:

- committing family violence, as defined by Family Code section 71.004,

- doing any act that is intended to result in physical harm, bodily injury, assault, or sexual assault against Daughter,

- doing any act that is a threat that reasonably places Daughter in fear of imminent physical harm, bodily injury, assault, or sexual assault,

- committing abuse of a child of the family or household as defined by Family Code section 261.001(1)(C), (E), (G), (H), (I), (J), (K) and (M),

- communicating in any manner with Daughter, except through Father's attorney or a person appointed by the trial court,

- going to, or near, or within 400 feet of, any location where Daughter is known by Father to be and remaining within 400 feet after Father becomes aware of Daughter's presence,

- going to or near the residences, child-care facilities, or schools Daughter normally attends or in which Daughter normally resides,

- removing Daughter from the possession of Mother.

The trial court also found that Father committed an act constituting a felony offense involving family violence against Daughter and ordered that the Order

---

[2] Father called the expert to testify as to issues relating to Mother's motion to exclude the witness from testifying.

continue in full force and effect until June 24, 2037 or until further order of the trial court.

### *Father's Post-Order Motion and Appeal*

Father timely filed a motion for new trial and motion to modify, correct, or reform the Order ("Motion for New Trial"). The trial court conducted a hearing on the motion and did not rule on the motion before it was overruled by operation of law.[3] Father has timely perfected this appeal from the Order under Family Code section 81.009.

## II. ISSUES AND ANALYSIS

On appeal, Father presents three appellate issues and asserts error based on various non-constitutional and constitutional complaints. We will address the non-constitutional complaints first, and then, if those complaints lack merit, we will address the constitutional complaints.

**A.    Is the evidence legally and factually insufficient to support the trial court's findings that family violence has occurred and that family violence is likely to occur in the future?**

In his second issue, Father asks whether there is insufficient evidence supporting the trial court's findings that (1) family violence has occurred, and (2) family violence is likely to occur in the future. *See* Tex. Fam. Code Ann. §85.001(a) (West, Westlaw through 2021 C.S.). If the trial court finds that family violence has occurred and that family violence is likely to occur in the future, the trial court: (1) shall render a protective order as provided by Family Code section 85.022 applying only to a person found to have committed family violence; and (2) may render a protective order as provided by Family Code section 85.021 applying

---

[3] After the motion was overruled by operation of law and while the trial court still had plenary power to grant the motion, the trial court signed an order denying the motion. *See* Tex. R. Civ. P. 329b(c).

to both parties that is in the best interest of the person protected by the order or a member of the family or household of the person protected by the order. *See* Tex. Fam. Code Ann. *See id*. § 85.001(b).

In reviewing a trial court's findings of fact for legal and factual sufficiency, we apply the same standards of review that we apply in reviewing jury findings. *Teel v. Shifflet*, 309 S.W.3d 597, 603 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). When reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *Teel*, 309 S.W.3d at 603. We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See City of Keller*, 168 S.W.3d at 827; *Teel*, 309 S.W.3d at 603. We must determine whether the evidence at trial would enable reasonable and fair-minded people to find the facts at issue. *See City of Keller*, 168 S.W.3d at 827; *Teel*, 309 S.W.3d at 603. The factfinder is the only judge of witness credibility and the weight to give to testimony. *See City of Keller*, 168 S.W.3d at 819; *Teel*, 309 S.W.3d at 603.

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Teel*, 309 S.W.3d at 603. After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Teel*, 309 S.W.3d at 603. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Teel*, 309 S.W.3d at 603. We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime*

12

*Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998); *Teel*, 309 S.W.3d at 603. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Teel*, 309 S.W.3d at 603.

> "Family violence" means:
>
> (1) an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself;
>
> (2) abuse, as that term is defined by Sections 261.001(1)(C), (E), (G), (H), (I), (J), (K), and (M), by a member of a family or household toward a child of the family or household; or
>
> (3) dating violence, as that term is defined by Section 71.0021.

Tex. Fam. Code Ann. § 71.004 (West, Westlaw through 2021 C.S.). "Abuse" as defined by subsection (1)(E) of Family Code section 261.001 means "sexual conduct harmful to a child's mental, emotional, or physical welfare, including conduct that constitutes the offense of continuous sexual abuse of a young child or disabled individual under Section 21.02, Penal Code, indecency with a child under Section 21.11, Penal Code, sexual assault under Section 22.011, Penal Code, or aggravated sexual assault under Section 22.021, Penal Code." Tex. Fam. Code Ann. § 261.001(1)(E) (West, Westlaw through 2021 C.S.). "Abuse" as defined by subsection (1)(G) of Family Code section 261.001 means "compelling or encouraging the child to engage in sexual conduct as defined by Section 43.01, Penal Code, including compelling or encouraging the child in a manner that constitutes an offense of trafficking of persons under Section 20A.02(a)(7) or (8), Penal Code, solicitation of prostitution under Section 43.021, Penal Code, or compelling prostitution under Section 43.05(a)(2), Penal Code." Tex. Fam. Code Ann. § 261.001(1)(G).

***1.*** ***Legal Sufficiency of the Evidence to Support the Finding that Family Violence Has Occurred***

In his second issue, Father asks "[i]s there insufficient evidence supporting the trial court's finding[] that . . . family violence has occurred. . .?" We liberally construe Father's second issue as asserting that the evidence is legally insufficient to support the trial court's finding that family violence has occurred. In his opening brief, Father does not provide any argument, analysis, or citations to the record or legal authority in support of the proposition that the evidence is legally insufficient to support the trial court's finding that family violence has occurred. Even construing Father's opening brief liberally, we cannot conclude that Father adequately briefed an argument that the evidence is legally insufficient to support this finding. *See Marathon Petroleum Co. v. Cherry Moving Co.*, 550 S.W.3d 791, 798 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Thus, we find briefing waiver on this point.[4] *See id.*

***2.*** ***Factual Sufficiency of the Evidence to Support the Finding that Family Violence Has Occurred***

Under his second issue, Father has briefed an argument that the evidence is factually insufficient to support the trial court's finding that family violence has occurred. The record contains the following evidence:

- Mother testified that shortly before December 6, 2017, (1) Daughter began making multiple trips to the restroom at night whereas she generally had been sleeping through the night without using the restroom; and (2) Daughter began complaining of vaginal pain every night.

- Mother stated that on December 6, 2017, Daughter told her that Daughter needed to tell her about something that had happened with Father when she was on a visit with him. According to Mother, Daughter told Mother that

---

[4] Even if there were no briefing waiver of this argument, we still would conclude that under the applicable legal standard, there is legally sufficient evidence to support the trial court's finding that family violence has occurred.

one night when Daughter had fallen asleep at Father's house, Father entered her room. Mother testified that, in describing what happened next, Daughter "talked about her legs being lifted up and feeling her — she said her dad's private parts between her legs and pushing into her." Mother stated that while Daughter was telling this to Mother, Daughter was crying, trying to put her head down, and covering her face. According to Mother, Daughter said she was so humiliated, and Daughter explained that afterwards, Father acted like everything was fine.

- Mother stated that according to Daughter, this incident occurred one to three months before December 6, 2017, and that Daughter begged Mother not to tell anyone about the incident because Daughter would "get in so much trouble." According to Mother, Daughter did not want this incident to be reported because Daughter thought Father would get very mad at her and she was afraid of what Father might say or do.

- The CPS records reflect that Mother does not have a criminal record.

- The day after Daughter's outcry, Passe testified that during a phone call with Mother, Mother told Passe that Daughter had disclosed that Father had engaged in a sexually inappropriate act with Daughter. According to Passe, Mother said that it seemed like Daughter was describing penetration.

- According to CPS records, Passe told CPS that Daughter had stated that Father had sexually abused her and penetrated her one time, early in the morning.

- According to Passe, Daughter said she was afraid that Father would go to jail and that she would not have a Father anymore, and Daughter was afraid of what Father's other daughters would think of her allegation.

- Osborne interviewed Mother who stated that Daughter described penetration by Father and that Daughter said she was humiliated. Mother told Osborne that Daughter is covering up and saying that it may have been a dream because Daughter does not want Father to get into trouble.

- Osborne spoke to Passe who stated that (1) Daughter told Passe about the abuse, and (2) Passe thinks Daughter only mentioned that it was a dream because Daughter is afraid of what could happen to Father.

- During a session with Passe on November 26, 2018, (1) Daughter said that Father told Daughter he loved her and missed her and that "nothing happened"; (2) Daughter told Passe that "it never happened! . . . it was a dream"; (3) Daughter stated that she is certain that it did not happen because

Father said it did not happen; and (4) Daughter said that had Father not denied it, Daughter would still believe that she was sexually abused by Father.

- Passe's notes reflect that in February 2019 Daughter said she had told two of her peers that she thought Father sexually abused her. Passe noted that Daughter had not recanted to these two peers.

- Passe testified that in her work, victims very frequently allege that "it might have been a dream." According to Passe, when children experience trauma, part of the incident is dissociative, and it does very much feel reminiscent of a dream. Passe stated that the way trauma memory works is that "there is fuzziness around the specifics of the trauma." Passe stated that feeling like the incident was a dream often is part of the coping mechanism employed by people to deal with trauma such as sexual abuse.

- According to Osborne, Passe told her that Daughter told Passe about the abuse and that Passe believes Daughter only said it was a dream because Daughter is afraid of what could happen to Father. Osborne stated that Osborne shared the same concern as Passe.

- According to Passe, recantation is often part of the process by which trauma victims or sexual-abuse victims disclose the trauma or sexual abuse.

- Mother testified that she was not present and that she does not know whether abuse occurred. Mother also testified that she believes that Daughter has been sexually assaulted by Father.

- Passe diagnosed Daughter as having attention deficit hyperactivity disorder and adjustment disorder. Passe also diagnosed Daughter with "child sexual abuse confirmed initial encounter," which according to Passe means that in Passe's professional experience, Passe assessed Daughter to "meet criteria for sexual abuse that has been confirmed with one time."

- Passe testified that Daughter's "behaviors are absolutely consistent with what would be the outcome of someone who's experienced sexual abuse."

- Six to eight weeks after Daughter's allegation of sexual abuse, Passe diagnosed Daughter with post-traumatic stress disorder.

- Passe testified that there are often two phases for the process by which a person discloses that they were sexually abused as a child—the tentative disclosure phase and the active disclosure phase.

- According to Passe, in the tentative disclosure phase the child is testing the waters, so the child might give a partial disclosure of the sexual abuse or might give details that are not completely accurate to gauge other people's response. The child might also recant some of the information that the child previously gave.

- Passe stated that the active disclosure phase often does not come until much later when the victim is able to say what happened, how it happened, when it happened, where it happened, and with whom it happened.

- Passe testified that Daughter is still in the tentative disclosure phase.

- Passe testified that in her work with trauma victims or sexual abuse victims, the victim almost always misses the abuser. Passe stated that it is common for children to want to be with their parents who have mistreated them.

- Passe testified that it is very rare for children to make false allegations of sexual abuse against a parent.

The above evidence supports a finding that Father sexually abused Daughter, and this evidence supports the trial court's finding that family violence has occurred.

The record also contains the following evidence:

- During the forensic interview of Daughter that took place on December 21, 2017, Daughter stated that one night when she was at her Father's house she had a dream that Father and Trainer came into her room. According to Daughter, Father and Trainer were not wearing pants, Father picked her up by her ankles and did something inappropriate. She stated that Father lifted her upside down and she thinks that his private part went inside of her. She stated that Trainer was next to Father talking while this was going on. According to CPS records, Daughter told the forensic interviewer that "she woke up and she [is] not sure if it was a dream or not." Daughter also told the interviewer that Daughter thinks the abuse was a dream because everything was normal the next day.

- According to CPS records, the day after Daughter's forensic interview, Daughter "made the same outcry [as she had during the forensic interview] to the medical staff [conducting her medical examination]."

- Father testified that Daughter was regularly having nightmares in 2016 and 2017.

- A nurse stated that the medical examination of Daughter "was normal." Osborne heard that the medical examination found no evidence of abuse.[5]

- Father told Osborne that the sexual abuse allegation is absolutely false and that he would never do anything like that to Daughter.

- The CPS records reflect that Father does not have a criminal record, and Father testified that in his 32 years working for his employer he had not one complaint, not one blemish on his record.

- Trainer stated that he has known Daughter since she was a baby and that the sexual abuse allegation is false. Trainer stated that Trainer would never be involved in witnessing a child being abused. Trainer stated that Father is a good father and that Trainer has never witnessed Father being inappropriate with Daughter.

- Father sent CPS the results of a polygraph test that Father took showing that Father was telling the truth.[6] Osborne testified that her supervisor indicated to her that they could rely on the polygraph test results because the person who conducted the polygraph test was the same person that the sheriff's department uses for polygraph tests. Osborne stated that in most of the investigations that she does when she addresses a person alleged to be the offender, the person does not run out and seek out who the police use for polygraphs to get a polygraph and give it to Osborne.

- Osborne testified that CPS contacted law enforcement and gave them the information regarding this case. As far as Osborne knows there has been no movement by the sheriff's department for any type of criminal charges.[7]

- At the hearing, Father denied sexually abusing Daughter.

---

[5] The evidence does not contain any document describing the medical examination or reporting the results of the medical examination.

[6] The evidence does not contain the results of the polygraph test or any evidence explaining the questions asked or other details of the polygraph test and results. Mother did not object to the evidence regarding the polygraph test, and we presume, without deciding, that we may consider this evidence. *See Leonard v. State*, 385 S.W.3d 570, 577–81 (Tex. Crim. App. 2012).

[7] No evidence was submitted to the trial court describing the status of any criminal-law-enforcement investigation into the sexual abuse allegation against Father or addressing whether a criminal prosecution of Father has been considered.

- CPS sent Mother a letter stating that CPS had completed its investigation of the alleged sexual abuse of Daughter by Father and that CPS made a finding of "Unable to Determine," meaning that there was insufficient information to conclude whether the alleged abuse occurred. According to Osborne, CPS made the "Unable to Determine" finding based on the polygraph test results and Daughter's uncertainty as to whether it was a dream. Osborne testified that if a child makes an outcry that could be considered sexual abuse, then CPS will not make a finding that sexual abuse is "ruled out." Osborne testified that there was significant evidence contradicting a finding of "reason to believe." Osborne stated that Osborne thought Daughter did not know whether the alleged abuse was a dream.

- Passe's notes reflect that in January 2019, Daughter continued to recant her allegations that Father sexually abused her.

- Mother testified that it would strike her as odd that Trainer would just be present when Father was sexually assaulting Daughter.

- Mother testified that she does not know whether sexual abuse actually occurred.

- Mother agreed that when Daughter indicated on December 8, 2017 that the incident was a dream, Father could not have suggested to Daughter that the incident was a dream because Father did not have access to Daughter from the date she made the outcry to Mother through December 8, 2017.

- On October 2, 2017, during the time period in which Daughter stated that the incident occurred, Daughter reported to Passe that her relationship with Father had improved. Passe testified that it is very unusual for a child who is being sexually assaulted to communicate to Passe during the period in which the child is being sexually abused that the child relationship with the abuser is improving.

- Passe testified that if a child makes a sexual abuse complaint against a parent the complaint is "likely real." Passe stated that she proceeds in her therapy by presuming that any allegation of sexual abuse is "real." Passe stated that it is not very difficult to know if a child has suffered sexual abuse.

- One of Father's adult daughters testified that she does not believe that Father is capable of sexually molesting Daughter and that she finds the sexual assault allegation against Father to be an incredible claim. That daughter testified that no matter what evidence is put before her, she is never going to believe that Father sexually abused Daughter. Two other adult daughters of Father testified, and each one stated that she does not believe Father is

19

capable of sexually molesting Daughter.

The above evidence supports a finding that Father did not sexually abuse Daughter, and that the incident described by Daughter in her outcry was a dream. This evidence would support a finding that family violence has not occurred or that the evidence before the trial court did not prove by a preponderance of the evidence that family violence has occurred.

There was testimony before the trial court that Daughter had various behavioral issues that sometimes were improving and at other times were getting worse. Mother's lawyer asserted that Daughter's issues worsened after her outcry and then again after her communications with Father in the fall of 2018. Mother's counsel argued that these behavior changes were linked to Father's sexual abuse during the incident in the fall of 2017 and to Father's communicating with Daughter in the fall of 2018, after having had no contact with Daughter since the outcry. Father's lawyer argued that Father did not sexually abuse Daughter and that Daughter had serious behavioral problems before her outcry. Father's counsel contended that Daughter's worsening behavior after her outcry was related to her accusing Father of sexual abuse that he did not commit and that Daughter's behavior worsened again after Daughter was cut off from communicating with Father in November 2018. On many points at issue in the evidentiary hearing before the trial court, the evidence was conflicting. Mother's lawyer asked the trial court to credit the evidence supporting a finding that Father had sexually abused Daughter and committed family violence. Father's lawyer asked the trial court to credit the denials of any wrongdoing by Father and by Trainer and argued that the sexual abuse allegation was unbelievable. Father did not argue that Mother lied about Daughter's outcry of sexual abuse; instead, Father's lawyer said he thinks that Daughter said something to Mother on December 6, 2017 along the lines of what Mother reported. Father's lawyer did not argue that Daughter had fabricated

20

her allegation of sexual abuse; instead, he suggested that Daughter had a dream in which Father sexually abused her.

Father asserts that (1) the record is replete with evidence that (a) Daughter was confused about whether the incident of sexual abuse was a dream, (b) later recanted, and (c) has reached out numerous times seeking contact with Father; (2) Father and Trainer denied that any sexual abuse occurred; (3) CPS closed its case and concluded that a preponderance of the evidence did not demonstrate that the alleged sexual abuse incident occurred; (4) Father volunteered for and passed a credible polygraph test; (5) Law enforcement has not taken action against Father or Trainer;[8] (6) Mother testified truthfully that she does not know if the incident happened; (7) Passe admitted that Daughter's behavior worsened after her outcry and the resulting loss of all contact with Father, not when the alleged sexual abuse occurred, one to three month before the outcry; (8) Passe stated that she cannot say for certain that sexual abuse by Father caused Daughter's worsening behavior rather than Daughter's allegation of sexual abuse; and (9) the testimony of three adult daughters of Father indicated that Father had not acted inappropriately.

We may not substitute our own judgment as to the credibility of the witnesses for that of the trier of fact. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Teel*, 309 S.W.3d at 603. In our factual sufficiency review, our role is not to find facts or make credibility determinations, and the trial court, as trier of fact, is the sole judge of the credibility of the witnesses and the weight to

---

[8] Although Osborne testified that as far as she knows there has been no movement by the sheriff's department for any type of criminal charges, no evidence was submitted to the trial court describing the status of any criminal-law-enforcement investigation into the sexual abuse allegation against Father or addressing whether a criminal prosecution of Father has been considered.

be given to their testimony. *Teel*, 309 S.W.3d at 603. The trial court was free to (1) credit the testimony supporting a finding that Father had sexually abused Daughter and committed family violence, and (2) discredit the testimony to the contrary, and we must defer to that determination. *See Dolgener v. Dolgener*, —S.W.3d—, —, 2021 WL 3883619, at *10–11 (Tex. App.—Houston [14th Dist.] Aug. 31, 2021, no pet.); *Caballero v. Caballero*, No. 14-16-00513-CV, 2017 WL 6374724, at *5 (Tex. App.—Houston [14th Dist.] Dec. 14, 2017, no pet.) (mem. op.). After examining the entire record, considering both the evidence in favor of, and contrary to, the trial court's finding that family violence has occurred and after considering and weighing all the evidence, we conclude that this finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[9] *See St. Germain v. St. Germain*, No. 14-14-00341-CV, 2015 WL 4930588, at *3–4 (Tex. App.—Houston [14th Dist.] Aug. 18, 2015, no pet.) (mem. op.); *Jackson v. Jackson*, No. 01-14-00952-CV, 2015 WL 8940117, at *4–5 (Tex. App.—Houston [14th Dist.] Dec. 15, 2015, no pet.) (mem. op.). The evidence is factually sufficient to support the trial court's finding that family violence has occurred.

## 3. *Legal Sufficiency of the Evidence to Support the Finding that Family Violence Is Likely to Occur in the Future*

Under his second issue, Father has briefed an argument that the evidence is

---

[9] Father has not cited any case in which a court holds that the evidence is factually insufficient to support a finding that family violence has occurred. Nor has Father cited any criminal case decided when factual sufficiency challenges were allowed in criminal cases, in which a court holds that the evidence was factually insufficient to support a conviction for indecency with a child under Penal Code section 21.11, sexual assault under Penal Code section 22.011, or aggravated sexual assault under Penal Code section 22.021. *See In re R.R.*, 373 S.W.3d 730, 734–35 & n.2 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (noting that factual sufficiency review no longer applies in criminal cases after the *Brooks* case in 2010, and concluding that factual sufficiency review is no longer available in juvenile cases).

legally insufficient to support the trial court's finding that family violence is likely to occur in the future. The statutes applicable to the issuance of a family-violence protective order under title 4 of the Family Code do not require that this finding be based on more than one act of family violence. *See Boyd v. Palmore*, 425 S.W.3d 425, 432 (Tex. App.—Houston [1st Dist.] 2011, no pet.). In determining whether family violence is likely to occur in the future in such protective-order cases, evidence that a parent has engaged in abusive conduct in the past permits an inference that the parent will continue this behavior in the future. *Teel*, 309 S.W.3d at 604. Though a pattern of family violence suffices to support a finding that family violence is likely to occur in the future, a pattern of family violence is not a necessary prerequisite to such a finding. *See Dolgener*, —S.W.3d at —, 2021 WL 3883619, at *12.

The trial court found that Father had committed family violence and that Father had committed an act constituting a felony offense involving family violence against Daughter. The trial court implicitly found that Father had sexually assaulted Daughter. Based on this finding, Father's denial that he had sexually assaulted Daughter was a false denial, and Father's failure to express any remorse for this sexual assault is some evidence supporting a finding that family violence is likely to occur in the future. *See Dolgener*, —S.W.3d at —, 2021 WL 3883619, at *12. In addition, evidence before the trial court indicated that when Daughter contacted Father by phone in October 2018, Father knew that she had done so without Mother's knowledge, and Father encouraged Daughter to continue communicating with him without Mother's knowledge. Father testified that he thinks it is a good idea for him to encourage Daughter, who has made this type of outcry, to have communications with Father without Mother's knowledge.

We presume, without deciding, that Father's oral agreement to not have any

contact with Daughter expired when CPS closed its investigation and that Father had the right under the divorce decree's possession order to have unsupervised visitation with Daughter on Thursdays beginning when Daughter was dismissed from school. Even under this presumption, on two consecutive Thursdays in March 2019, Father appeared at Daughter's school unaccompanied and sought to pick Daughter up from school. Before attempting to do so, Father did not consult or notify Passe, Daughter's therapist. Though Father sent emails to Mother in advance about his plans to pick Daughter up from school, he did not receive a response to these emails, and Father did not know whether Mother had received or read these emails. Though the divorce decree would entitle Father to unsupervised overnight visitation with Daughter on Thursdays, Father testified that he planned to have only a two-hour "accompanied" visitation period with Daughter, in the company of "[t]he whole family." But, Father admitted during his testimony on cross-examination that he was alone both times in March 2019 when he tried to pick Daughter up from school. Addressing the second attempt to pick up Daughter on March 28, 2019, Father testified that when he appeared at Daughter's school to try to pick her up, Father was served with the Original Temporary Order. According to Father, but for the Original Temporary Order, Father would have picked up Daughter from school that day by himself, unaccompanied by anyone. On redirect examination, Father stated that he planned to pick Daughter up from school by himself and then take her to the house of one of his adult daughters.

On appeal, Father asserts that the trial court could have issued a protective order allowing Father only supervised access to Daughter. Father contends that such an order would have been consistent with his request for only supervised access to Daughter and would have foreclosed the possibility that family violence could occur in the future. This argument fails for several reasons. Though the trial

24

court had the power to issue a protective order allowing Father to have only supervised access to Daughter, the trial court was only authorized to do so after finding that family violence had occurred and was likely to occur in the future. *See* Tex. Fam. Code Ann. § 81.001, 84.001(a); 85.001; 85.002 (West, Westlaw through 2021 C.S.); *Taylor v. Taylor*, 608 S.W.3d 265, 268–69 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (concluding that without findings that family violence has occurred and is likely to occur in the future, a trial court may not issue a family-violence protective order unless a person has violated an existing protective order—not a temporary ex parte order—when the protective order was in effect and the protective order has since expired). Thus, the trial court's power to allow Father supervised access in a protective order cannot be a basis for finding that family violence is not likely to occur in the future because the trial court may only exercise that power after finding that family violence is likely to occur in the future. When the trial court issued the Order, the divorce decree's possession order gave Father the right to unsupervised periods of possession with Daughter. In this context, the trial court could not properly analyze whether family violence is likely to occur in the future by presuming a supervised-access restriction that did not exist. In addition, the record does not reflect that Father asked, in the alternative, that if the trial court granted a protective order, the trial court should allow Father supervised access to Daughter rather than issuing a no-contact order.

Finally, during closing arguments Father's lawyer asked the trial court to deny Mother's application for a protective order and allow the 311th District Court the opportunity to issue a temporary order under which Father may only see Daughter in a "therapeutic session" so as to "[l]et that therapist look at that situation." Father testified that if the trial court denied Mother's application for a protective order, Father would not exercise his rights to possession under the

25

divorce decree; instead Father indicated that he would go to the 311th District Court to seek an order or agreement with regard to "therapeutic visitation." Father testified that in this situation he did not intend to have contact with Daughter outside of a therapeutic setting "to begin with." At the evidentiary hearing, Father was asked what his intention was as to his periods of possession with Daughter if the trial court denied Mother's application for a protective order. Father answered: "I think we need to work our way into it. I can't just immediately have [Daughter] full time. I got to have — probably needs to be accompanied by some — I'm absolutely willing to do some kind therapeutic psycho [sic] — whatever the best thing is to do to reunite with my daughter." Though Father's position regarding therapeutic visitation in the trial court was not entirely clear, we conclude that Father did not agree that if the trial court denied Mother's application for a protective order, Father would agree to a modification of the possession order so that Father would indefinitely have only supervised visitation or supervised, therapeutic visitation. Instead, Father seems to have indicated that he would agree to an initial short-term arrangement of therapeutic visitation with the goal of re-establishing unsupervised periods of possession by Father.

Father also relies on *In re I.E.W.*, No. 13-09-00216-CV, 2010 WL 3418276, at *8 (Tex. App.—Corpus Christi Aug. 27, 2010, no pet.) (mem. op.). But, the parts of that case on which Father relies are obiter dicta because the order in *I.E.W.* did not include a finding that family violence was likely to occur in the future and thus the order had to be reversed on that basis alone. *See In re I.E.W.*, 2010 WL 3418276, at *6, *9. In addition, the *I.E.W.* court stated that the agreed protective order in that case was issued despite the fact that no facts had been alleged that would support a finding of a likelihood of future violence. *See id.* at *8. In today's case there was evidence before the trial court supporting a finding that family

violence is likely to occur in the future.

Considering the evidence in the light most favorable to the trial court's finding that family violence is likely to occur in the future, indulging every reasonable inference that would support the finding, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not, we conclude that the evidence at the evidentiary hearing would enable reasonable and fair-minded people to find that family violence is likely to occur in the future. *See Dolgener*, —S.W.3d at —, 2021 WL 3883619, at *12; *Johnson v. Johnson*, No. 13-12-00080-CV, 2012 WL 3525655, at *3 (Tex. App.—Corpus Christi Aug. 16, 2012, no pet.) (mem. op.); *Boyd*, 425 S.W.3d at 432; *Teel*, 309 S.W.3d at 603–04. The evidence is legally sufficient to support the trial court's finding that family violence is likely to occur in the future.

### 4. *Factual Sufficiency of the Evidence to Support the Finding that Family Violence Is Likely to Occur in the Future*

In his second issue, Father asks "[i]s there insufficient evidence supporting the trial court's finding[] that . . . family violence has occurred. . .?" We liberally construe Father's second issue as asserting that the evidence is factually insufficient to support the trial court's finding that family violence is likely to occur in the future. In his opening brief, Father does not provide any argument, analysis, or citations to the record or legal authority in support of the proposition that the evidence is factually insufficient to support the trial court's finding that family violence is likely to occur in the future. Even construing Father's opening brief liberally, we cannot conclude that Father adequately briefed an argument that the evidence is factually insufficient to support this finding. *See Marathon Petroleum Co.*, 550 S.W.3d at 798. Thus, we find briefing waiver on this

27

point.[10] *See id.*

We overrule Father's second issue.

**B.    Did the trial court impose restrictions or limitations on Father's right to possession or access that exceeded those required to protect Daughter's best interest?**

On appeal, Father asserts that the trial court could have imposed less restrictive protections that allowed for contact between Father and Daughter through supervised visitation.  Father also quotes obiter dicta from the *In re I.E.W.* case, in which the Thirteenth Court of Appeals applied Family Code section 153.193 to a family-violence protective order under title 4 of the Family Code. *See* Tex. Fam. Code Ann. § 153.193 (West, Westlaw through 2021 C.S.); *In re I.E.W.*, 2010 WL 3418276, at *8. In this statute, the Legislature provides that the terms of an order that "imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." Tex. Fam. Code Ann. § 153.193. Liberally construing Father's opening brief, we conclude that Father argues that the trial court exceeded what was required to protect Daughter's best interest, thus violating Family Code section 153.193, when the trial court issued a protective order that did not allow any contact between Father and Daughter rather than issuing a protective order allowing supervised visitation between Father and Daughter. We presume, without deciding, that Father timely preserved error on this argument in the trial court in his Motion for New Trial and that Family Code section 153.193 applies to family-violence protective orders.

The trial court found that the protective orders contained in the Order were for the safety and welfare and in the best interest of Daughter, and that these orders

---

[10] Even if there were no briefing waiver of this argument, we still would conclude that under the applicable legal standard, there is factually sufficient evidence to support the trial court's finding that family violence is likely to occur in the future.

were necessary for the prevention of family violence. Recognizing that some cases raise serious concerns surrounding possession of and access to children, the Family Code gives trial courts leeway to tailor orders on these matters to suit the unique circumstances and potential risks a parent may present to the children's welfare. *Brandon v. Rudisel*, 586 S.W.3d 94, 107 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Reviewing courts have upheld the complete denial of possession of or access to a child in cases in which the parent committed sexual abuse or the record contained evidence of a risk that the parent would commit sexual abuse in the future. *See id*. at 108; *see also In re S.A.J.*, No. 14-20-00216-CV, 2020 WL 4689361, at *3 (Tex. App.—Houston [14th Dist.] Aug. 13. 2020, pet. denied) (stating that "[i]n some cases, the trial court's limitation [of the rights of a possessory conservator] may amount to a complete denial of possession and access, especially where, as here, there was evidence of family violence") (mem. op.). Presuming that Family Code section 153.193 applies to the Order and that Father preserved error on this argument, we conclude that the trial court did not err in implicitly determining that a no-contact protective order did not exceed what was required to protect Daughter's best interest, based on the trial court's implied finding that Father sexually assaulted Daughter. *See* Tex. Fam. Code Ann. § 153.193; *In re F.A.*, No. 02-16-00156-CV, 2017 WL 632913, at *1–6 (Tex. App.—Fort Worth Feb. 16, 2017, no pet.) (holding trial court did not err by issuing an order denying a father possession and access to his daughter based on trial court's finding that father had a history or pattern of sexual abuse against his daughter and that awarding father access to daughter would endanger her physical health or emotional welfare and would not be in her best interest, based on evidence father had sexually abused his daughter by conduct constituting indecency with a child, though father had not been criminally prosecuted) (mem. op.); *Tran v. Nguyen*, 480 S.W.3d 119, 126–27 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (holding

that, notwithstanding the terms of Family Code section 153.193, the trial court did not err by failing to allow father supervised visitation in prison with his biological daughters and in denying father possession and access to these daughters based on father's conviction for the aggravated sexual assault of his stepdaughter); *In re Marriage of Bonner*, 10-10-00011-CV, 2010 WL 4409704, at *1–2 (Tex. App.—Waco Nov. 3, 2010, no pet.) (holding that the trial court did not err by denying father possession and access to his daughters based on father's conviction for indecency with a child and other offenses as to his stepdaughter and her friend) (mem. op.).

## C.     Does the Order effectively terminate the parent-child relationship between Father and Daughter?

Under his first issue, Father asserts that the Order effectively terminates the parent-child relationship between Father and Daughter and that the substance of the Order is an order terminating this relationship. Based on this premise, Father asserts that the trial court violated the Family Code and acted unconstitutionally by failing to adhere to "procedures and safeguards" that apparently include the following: (1) the requirement under federal due process and section 161.001(b) of the Texas Family Code that the statutory elements for terminating a parent-child relationship be proved by clear and convincing evidence; (2) Father's right under Family Code section 105.002 to a jury trial as to whether the parent-child relationship between Father and Daughter should be terminated; (3) the requirement under Family Code section 107.021(a-1) that in a private proceeding to terminate the parent-child relationship, the trial court must appoint an amicus attorney or an attorney ad litem, unless the court finds that the interests of the child will be represented adequately by a party to the suit whose interests are not in conflict with the child's interest; and (4) the determination of the best interest of the child based on the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–

30

72 (Tex. 1976).

We presume, without deciding that Father timely preserved error on this argument in the trial court in his Motion for New Trial. This court gives effect to the substance of the Order, rather than its form or title. *See Jacobs v. Alt*, No. 14-15-00028-CV, 2016 WL 1576415, at *2 (Tex. App.—Houston [14th Dist.] Apr. 19, 2016, no pet.) (mem. op.). A review of the Order shows that its substance is a no-contact family-violence protective order under title 4 of the Family Code. Father asserts that the Order effectively terminates the parent-child relationship between Father and Daughter because the Order provides that it will continue in full force and effect until June 24, 2037 or until further order of the trial court. Daughter was born in 2007, and Father was born in 1955.

Under the parties' divorce decree, Father has each of the following rights:

- the right to receive information from Mother concerning Daughter's health, education, and welfare,

- the right to confer with Mother to the extent possible before making a decision concerning Daughter's health, education, and welfare,

- the right of access to Daughter's medical, dental, psychological, and educational records,

- the right to consult with Daughter's physician, dentist, or psychologist,

- the right to consult with school officials concerning Daughter's welfare and educational status, including school activities,

- the right to be designated on the child's records as a person to be notified in case of an emergency.

Even after the issuance of the Order, Father continues to possess each of these rights.

Under Family Code section 85.025, Father may file two successive motions asking the trial court to review the Order and determine whether there is a continuing need for the Order:

31

(b) A person who is the subject of a protective order may file a motion not earlier than the first anniversary of the date on which the order was rendered requesting that the court review the protective order and determine whether there is a continuing need for the order.

(b-1) Following the filing of a motion under Subsection (b), a person who is the subject of a protective order issued under Subsection (a-1) that is effective for a period that exceeds two years may file not more than one subsequent motion requesting that the court review the protective order and determine whether there is a continuing need for the order. The subsequent motion may not be filed earlier than the first anniversary of the date on which the court rendered an order on the previous motion by the person.

(b-2) After a hearing on a motion under Subsection (b) or (b-1), if the court does not make a finding that there is no continuing need for the protective order, the protective order remains in effect until the date the order expires under this section. Evidence of the movant's compliance with the protective order does not by itself support a finding by the court that there is no continuing need for the protective order. If the court finds there is no continuing need for the protective order, the court shall order that the protective order expires on a date set by the court.

Tex. Fam. Code Ann. § 85.025 (West, Westlaw through 2021 C.S.). If the trial court were to grant a motion by Father under subsection (b) or (b-1) of Family Code section 85.025 and find no continuing need for the Order, the Order would expire before June 24, 2037. *See id.*

In addition, under Family Code section 87.001, "[o]n the motion of any party, the court, after notice and hearing, may modify an existing protective order to: (1) exclude any item included in the order; or (2) include any item that could have been included in the order." Tex. Fam. Code Ann. § 87.001 (West, Westlaw through 2021 C.S.). Under this statute, the trial court retains jurisdiction and authority to modify the Order throughout its pendency, including after this appeal from the Order comes to an end. *See id.*; *L.S. v. Shawn*, No. 13-17-00224-CV, 2018 WL 4100857, at *2–3 (Tex. App.—Corpus Christi Aug. 29, 2018, no pet.)

32

(mem. op.); *In re S.S.*, 217 S.W.3d 685, 686–87 (Tex. App.—Eastland 2007, no pet.); *Cooke v. Cooke*, 65 S.W.3d 785, 788 (Tex. App.—Dallas 2001, no pet.). During the effective period of the Order, the trial court retains the power and jurisdiction on the motion of any party, and after notice and hearing, to modify the Order by either deleting or adding items to the order, without any requirement of a showing of changed circumstances. *See* Tex. Fam. Code Ann. § 87.001; *L.S.*, 2018 WL 4100857, at *2–3; *In re S.S.*, 217 S.W.3d at 686–87; *Cooke*, 65 S.W.3d at 788. Thus, though the Order was final and appealable when it was rendered, the trial court has the power in the future to grant a motion by Father to modify the Order, for example to allow Father supervised visitation with Daughter. *See* Tex. Fam. Code Ann. § 87.001; *In re S.S.*, 217 S.W.3d at 686–87.

Father has not cited and research has not revealed any case in which a court holds that (1) a family-violence protective order effectively terminates a parent-child relationship, or (2) the substance of such an order is an order terminating a parent-child relationship. Father relies on the Fourth Court of Appeals's opinion in *In re I.L. See* 580 S.W.3d 227, 237–40 (Tex. App.—San Antonio 2019, pet. dism'd). In that case, the court of appeals determined that a mother was entitled to appointment of counsel under Family Code section 107.013(a)(1), along with the accompanying right to effective assistance of counsel, in a suit in which a governmental entity sought to terminate her parent-child relationship. *See id.* The court also held that the mother did not retroactively lose her right to effective assistance of counsel because the trial court did not terminate her parent-child relationship. *See id.* The *In re I.L.* court did not address whether any order effectively terminated a parent-child relationship or whether the substance of any order was an order terminating a parent-child relationship. *See id.* Thus, *In re I.L.* is not on point as to the analysis at hand.

We conclude that the Order does not effectively terminate the parent-child

33

relationship between Father and Daughter and that the substance of the Order is not an order terminating the parent-child relationship between Father and Daughter. *See Turner v. Roberson*, No. 05-11-01272-CV, 2013 WL 2152636, at *3–4 (Tex. App.—Dallas May 17, 2013, no pet.) (mem. op.); *Green v. Green*, 850 S.W.2d 809, 811 (Tex. App.—El Paso 1993, no writ). The premise of Father's argument that the trial court violated the Family Code and acted unconstitutionally by failing to adhere to various "procedures and safeguards" is that the Order effectively terminates the parent-child relationship between Father and Daughter or that the substance of the Order is an order terminating this relationship. Because the premise is not correct, we conclude that this argument lacks merit.

**D. Did Father preserve error in the trial court as to various complaints?**

Liberally construing Father's opening brief, we conclude that Father has asserted the following appellate complaints:

- When Mother filed her application for a protective order, Father had already filed a suit seeking modification of conservatorship in the 311th District Court, the court of continuing, exclusive jurisdiction as to matters under title 5 of the Family Code. The Order operates as a permanent conservatorship-modification order. As a matter of statutory law, the trial court erroneously violated the "procedures and safeguards" applicable under the Family Code to a modification action, apparently including Father's statutory rights to (1) a jury trial on custody under Family Code section 105.002; (2) temporary orders under Family Code section 105.001, (3) a full custody evaluation under Family Code section 107.103, (4) "full adversarial discovery" in the modification proceeding, (5) the alleged requirement under Family Code sections 153.009 and 153.134(a)(6) that the trial court determine and consider Daughter's preferences for custody and visitation; and (6) the right to have the best interest of the child determined based on the *Holley* factors. *See Holley*, 544 S.W.2d at 371–72.

- When Mother filed her application for a protective order, Father had already filed a suit seeking modification of conservatorship in the 311th District Court, the court of continuing, exclusive jurisdiction as to matters under title 5 of the Family Code. The Order operates as a permanent conservatorship-modification order. The trial court erred by unconstitutionally failing to

adhere to the "requisite procedures and safeguards," apparently including Father's statutory rights to (1) a jury trial on custody under Family Code section 105.002; (2) temporary orders under Family Code section 105.001, (3) a full custody evaluation under Family Code section 107.103, (4) "full adversarial discovery" in the modification proceeding, (5) the alleged requirement under Family Code sections 153.009 and 153.134(a)(6) that the trial court determine and consider Daughter's preferences for custody and visitation; and (6) the right to have the best interest of the child determined based on the *Holley* factors. *See Holley*, 544 S.W.2d at 371–72.

- The trial court has demonstrated an inclination to rule in favor of anyone requesting a protective order for any duration, without regard for the heightened legal rights implicated in Title 5 proceedings.

- The protective-order statute "was unconstitutional as applied *in this case*" because the "trial court (1) imposed a protective order of unreasonable duration, (2) refused to consult [Daughter] about her desires, (3) refused to appoint amici to represent [Daughter's] desires or best interest, (4) refused to order an independent evaluation of [Daughter], and (5) refused to consider less-drastic alternatives to achieve the least-restrictive means of ensuring Father's and [Daughter's] right to maintain their relationship was respected."

- The protective-order statute as applied by the trial court in this case violated the due process rights of Father and Daughter.

In none of these complaints does Father assert that the evidence is legally or factually insufficient, and none of these complaints falls under an exception to the requirement that Father preserve error in the trial court. *See* Tex. R. App. P. 33.1(d); *In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003). To succeed on each of these complaints on appeal, Father must have preserved error in the trial court, including the complaints in which Father asserts violations of due process or other constitutional rights. *See In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003) (holding that, to preserve a complaint for appellate review, including a constitutional complaint, party must present the complaint to trial court by timely request, motion, or objection, state specific grounds therefore, and obtain ruling and that appellant failed to preserve error on his due process complaint); *In re J.S.*, No. 05-16-00138-CV, 2017 WL 894541, at *2 (Tex. App.—Dallas Mar. 6, 2017,

no pet.) (rejecting appellant's complaint that trial court failed to interview her children in chambers under Family Code section 153.009 because appellant failed to preserve error by raising this complaint during the bench trial) (mem. op.); *Eckchum v. State for Protection of Ketchum*, No. 03-15-00270-CV, 2016 WL 3677122, at *6–7 (Tex. App.—Austin Jul. 7, 2016, no pet.) (holding appellant failed to preserve error in the trial court as to her complaint that a protective-order statute was unconstitutional, as applied to her) (mem. op.); *Fontenot v. Stinson*, 369 S.W.3d 268, 276 n.10 (Tex. App.—Houston [14th Dist.] 2011) (holding that appellant was required to preserve error in trial court on complaint that statute, as applied to her, was unconstitutional), *aff'd on other grounds*, 435 S.W.3d 793 (Tex. 2014) (per curiam). Because Father did not preserve error in the trial court on any of these complaints, none of the complaints provides a basis for reversing the Order. *See In re L.M.I.*, 119 S.W.3d at 710–11; *In re J.S.*, 2017 WL 894541, at *2; *Eckchum*, 2016 WL 3677122, at *6–7; *Fontenot*, 369 S.W.3d at 276 n.10.

Having found no merit in any of the complaints Father asserts under his first issue, we overrule that issue.

## E.     Has Father sufficiently briefed his third issue?

In his third issue, Father asks "[i]s there insufficient evidence to support the trial court's findings that (1) 'good cause' existed for ordering 'no contact,' and (2) an order exceeding the statutory default duration of 2 years was warranted?" We liberally construe Father's third issue as asserting that the evidence is legally and factually insufficient to support (1) the trial court's finding that "good cause" existed for ordering that Father have no contact with Daughter; and (2) the trial court's finding that a family-violence protective order exceeding the statutory default duration of 2 years was warranted. In his opening brief, Father does not provide any argument, analysis, or citations to the record or legal authority in

support of the proposition that the evidence is legally or factually insufficient to support either finding. Even construing Father's opening brief liberally, we cannot conclude that Father adequately briefed an argument that the evidence is legally or factually insufficient to support either finding. *See Marathon Petroleum Co.*, 550 S.W.3d at 798. Thus, we find briefing waiver on these points.[11] *See id*. We overrule Father's third issue.

### III. CONCLUSION

We find briefing waiver as to the complaint that the evidence is legally insufficient to support the trial court's finding that family violence has occurred and as to the complaint that the evidence is factually insufficient to support the trial court's finding that family violence is likely to occur in the future. We conclude that the evidence is factually sufficient to support the trial court's finding that family violence has occurred and legally sufficient to support the trial court's finding that family violence is likely to occur in the future. Presuming that Family Code section 153.193 applies to the Order and that Father preserved error on this argument, we conclude that the trial court did not err in implicitly determining that a no-contact protective order did not exceed what was required to protect Daughter's best interest, based on the trial court's implied finding that Father sexually assaulted Daughter. The premise of Father's argument that the trial court violated the Family Code and acted unconstitutionally by failing to adhere to various "procedures and safeguards" is that the Order effectively terminates the parent-child relationship between Father and Daughter or that the substance of the Order is an order terminating this relationship. Because the premise is not correct, we conclude that this argument lacks merit. We conclude that Father failed to

---

[11] Even if there were no briefing waiver on these points, we still would conclude that under the applicable legal standard, the evidence is legally and factually sufficient to support each finding.

preserve error in the trial court as to various complaints and that even construing Father's opening brief liberally, we cannot conclude that Father adequately briefed an argument under his third issue.

Having found that all of Father's appellate complaints lack merit, we affirm the Order.


/s/    Randy Wilson
        Justice


Panel consists of Justices Jewell, Poissant, and Wilson.